I think the microphone only records your voice. I don't think it's amplifying your voice, so you'll have to speak up just a bit more. And these are not the best acoustics. It may be a beautiful courtroom, but it doesn't have the best acoustics. My name is Justin Lum. I represent the Petitioner, Yosefi-Talouri. Your Honors, today I'd like to focus on two issues in this case. The first is that the decision of the Board of Immigration Appeals, the BIA, and the immigration judge were based on unreasonable inferences based upon the evidence that was presented in the form of testimony and documents by Mr. Yosefi-Talouri. Counsel, do I understand that you have not – you are not appealing from the denial of asylum? Is that correct? Yes, Your Honor, because the BIA, I believe the – yes, that is correct. So we are only here on withholding of removal and CAT? Yes, Your Honor, that is correct. Your Honors, it is our position that the immigration judge has made unreasonable inferences based upon the evidence presented, that the testimony and the evidence presented by Mr. Yosefi-Talouri was consistent and was not inconsistent as has been argued by the Attorney General. From the outset of what Mr. Yosefi-Talouri described, what occurred – what happened to him and his family in Iran before they went to – before he went to Sweden, the fact that he did receive asylum in Sweden, that he returned on the basis of the Iranian government promising that things would be better for educated individuals, that he was then – that upon his return, his passport was taken, he was – he was required to spy in Sweden in order to be allowed to leave, that his brother was – that one brother was arrested and that another brother lost his job, and actually, the brother that was arrested is still in jail, that the brother that was arrested is based upon his participation in a pro-Shah group, that the – that the – that Mr. – both Mr. Yosefi-Talouri and his brother received – received summons from the Iranian government. Mr. Yosefi-Talouri received one which said – which basically said in 1992, 7 years after he had left, that he needed to come in because of his activities in pro-Shah groups. In addition, when he went – when he came to the United States, Mr. Yosefi-Talouri, even though it's been argued by both the immigration judge and the government – or, I'm sorry, the attorney general, that – that he's committed marriage fraud, Mr. Yosefi-Talouri never received any advantage and he never profited from his marriages here, and in fact, testified that although he married twice before, that in both cases, the first case, he immediately annulled the marriage because he did not – But he admitted that was a sham, didn't he? Well, Your Honor, he – his – his first wife at that time told him that was the only way he could stay. So he made the mistake of getting into the marriage, but quickly annulled it. He said it was not for the right reason. He specifically said that he felt that – that she only wanted to – she – she loved him and he didn't really think he loved her or she might have wanted a child with him. He wanted a green card. Well, Your Honor, it's – if he had wanted a green card, then he would have – he would have maintained that marriage since from his testimony, it's evident that his – that – that first wife did care for him. And yet – and in the – and as far as the second marriage, again, if he had really wanted the green card, if he'd wanted to – if he'd wanted to go forward, then he would have stayed in the marriage. He would have done whatever he could to stay in the marriage. He didn't do that. And at the time of the second marriage, he was already in removal proceedings. He could have, if he had wanted, brought – brought – brought it up with the court, tried to change his – his relief from asylum to adjustment of status. He didn't do that. So, Your Honor, we would submit that because he acted, he – he acted – he acted honorably. He – he – those marriages did not work. He didn't stand them for the purposes of immigration. He didn't maintain them. He was – in both cases, first it was annulled, then he divorced. Counsel, the – IJ finds that your client is not credible. But even if we thought that he was credible, your – your client is going to have a very difficult time making a case as to why it is more likely than not that he's going to be – he's going to be persecuted on political grounds if he returns to Iran. He has gone in and out of the country freely. The Iranian authorities had no trouble issuing him a passport, letting him back into Iran. He's – he's come and gone freely. He has – he came to the United States under the – under the pretenses of a – of a one-month stay, evidently for – for pleasure. He doesn't come here and apply for asylum. I mean, there's just – it's just not a very powerful case. So what have you got to show us that if he goes back to Iran, he's going to be persecuted? Well, Your Honor, a summons from the government is – is – is not – not particularly compelling evidence. I understand, Your Honor. Your Honor, Mr. Yousefiq Taluri received – in 1992, when he returned, he received – he – well, first of all, he testified that upon returning, his passport was taken away, that he was told by the Iranian government that he would have to spy on people in Sweden. At that time, he – there were two documents that were produced before the immigration which – which showed, one, that the Iranian government called him in for questioning based upon his participation in pro-Shah – pro-Shah – pro-Shah groups. Now, Your Honor, that was seven years before. So the fact that – the fact that – that 15 years have passed does not mean the Iranian government still does not have that information. We'll still not pursue him for that. In addition, his brother – Well, I – I agree. Again, conceding – if we start from the premise that your client is completely credible and that we're going to credit everything that he says, which the IJ didn't, it is – it's unpleasant to be summoned in by one's government, and that's not the kind of thing that we would do here. But how does that demonstrate that it is more likely than not that he's going to be persecuted upon his return? He hasn't been persecuted yet. He was called in for questioning. Well, Your Honor, I believe – Does questioning arise to the level of persecution? Well, Your – in and of itself, no, Your Honor. Okay. Confiscating his passport for four months, does that arise to the level of persecution? Again, I – this is – this is – there may be some validity to the complaints that they're sealing him out. Well, I believe if it's confiscated for the reasons it was that – that to question him about – about his previous activities, the fact that his brother was a member of a pro-Shah group, that he had participated in – in pro-Shah activities and anti-Islamic government activities both in Iran and in Sweden, that – that his brother was jailed for being a member of a pro-Shah group and is still in jail, these are all factors that will affect him if he is returned to Iran. It's not – again, it's not as if the government is going to forget that. In addition, they requested that he – or they demanded that he spy for them in Sweden. He didn't do that. Instead, he went to the United States. That is an – that is an additional matter. Since he was required to do that in order to get his passport and leave, that – that's another thing the Iranian government will hold against him, will – will most likely put him in jail for those reasons. And you have about a minute left, if you'd like to reserve some time. Well, Your Honor, the second – the second point I'd like to make, Your Honor, is that – very quickly – is that the immigration court and the BIA should have – should have also granted some – some deference to the fact that this individual received asylum in Sweden. He didn't prove – he didn't provide any documentation as to what he provided to the Swedish authorities. He had no – no grounds for proving on what basis he was granted asylum in Sweden. We don't know what the Swedes were thinking. Well, Your Honor, he did testify to that. Again – I'm sorry. He didn't – he didn't testify to that? He did testify that he received asylum in Sweden. Right. Okay. But he was given ample opportunity to come forward and provide some kind of documentation as to what he provided to the Swedish authorities. We have no idea what the basis was for granting asylum in Sweden. Well, Your Honor, he – he did have – he did testify, and he did testify as to what occurred. Okay. If he – if he was granted asylum in Sweden, does that, per se, qualify him for asylum in the United States? Well, Your Honor, I – just very quickly, I believe that that – that that does have application to his withholding of removal, because it demonstrates that he was – he did receive past persecution in Iran. Well, we don't – we don't know that. We have no idea what the – what the Swedish authorities were thinking. We – he hasn't provided anything to us. Well, Your Honor, that goes again to whether his – that goes again to whether – well, whether this Court determines he's – that the Swedish Government granted him asylum. Well, we don't – that – okay. You have Easter time. Thank you. Thank you. Good morning. May it please the Court, Frederick Phillips on behalf of the United States. Your Honors, the record in this case simply doesn't compel the conclusion that the petitioner is more likely than not to be persecuted if he's returned to Iran. The record in this case shows that the petitioner really never made out any case of persecution or legitimate fear of future persecution. He makes no claim to ever have been arrested. He makes no claim to ever have been detained, but for briefly, apparently, at an airport when he returned from Sweden. The facts in the record simply don't support a finding that it's more likely than not that he will be persecuted if returned to Iran. The facts in the record are that, although the revolution that Petitioner claims to have been an active opponent of took place in 1979, he lived peaceably, apparently, until 1985 in Iran without incident. He then was granted permission to leave the country. He was granted a passport and an exit visa. He moved to Sweden. The fact of the matter is that the record doesn't tell us much, as the immigration judge pointed out, the record doesn't tell us much about why he was granted asylum in Sweden. Is Sweden signatory to the Convention on Torture or the Refugee Treaty? Your Honor, I believe so, but I'm not absolutely certain. Behrs mentioned that while in Iran, the Petitioner served in the military briefly and apparently received something on the order of an honorable discharge. He lived in Sweden for approximately seven years. Again, there was no testimony to suggest that he was ever detained, that he was ever harassed. He claimed that when he moved back to Sweden in 1992, after having spent several months back in Iran, that he received 20 or 30 phone calls, which he assumed to be from, I think he said personnel of the Iranian embassy, although he never identified in any greater detail who those people were, what those phone calls were about. He made claims that the Iranian government was attempting to prevail upon him to spy for the Iranian government in Sweden. But again, he, as the immigration judge found, he offered no detail whatsoever concerning who was attempting to prevail upon him to do the spying or upon whom he was supposed to be spying or for what reason or what sort of information he was supposed to collect. Really, the only record evidence of the Petitioner's political involvement that might raise any concern at all is he says that he distributed flyers opposing the fundamentalist government while he was in high school. Do I understand correctly that he was represented at the hearing? Yes, Your Honor. Yes. The hearing actually, there was a number of continuances at the request of counsel for both sides, and so there was some delay between the time of the initial scheduling and the actual hearing. But, yes, he was afforded a full hearing and was represented by counsel. And had a Farsi interpreter. Yes, Your Honor. The standard is that the agency's findings are conclusive unless any reasonable adjudicator would be compelled to reach a contrary result. And so this Court must affirm the Board of Immigration Appeals unless it were to find that the Petitioner's evidence was so compelling that no reasonable fact finder could fail to find a Petitioner's favor. We are familiar with those standards. Thank you, Your Honor. The bottom line, I suppose, is that when one examines the record, one just finds that there is no specific evidence of any persecution ever. Never does the Petitioner name an organization of which he was a member. Never does the Petitioner identify a particular demonstration or other activity in which he took part. He says when he comes to the United States, he was going to just stay a week or so. Then he stays five years or whatever. And when we suggest sending him back to Sweden, he said he's afraid for his life in Sweden. Is there any basis for that? Well, that's interesting, Your Honor, because he did make that claim, although he says that he fled Sweden in fear of his life. Although the record shows that he actually obtained a visa to come to the United States in 1993 and then let that visa lapse and stayed in Sweden for another year and then reapplied and got a second visa and came finally in 1994. It's also worth noting that in the Petitioner's asylum application, he notes that when he came to the United States, he came with no intention of staying here. And so it sort of suggests that – it suggests to me, at least, that when he says he fled Sweden in fear of his life, that that may not have been altogether true. Well, and he didn't apply for asylum until he was picked up, did he? I believe that's correct also. I believe that a notice to appear was issued in 1999 and Petitioner filed his asylum application only in 2000, after he'd been in the country for about six years. Was he resettled in Sweden? Yes, he was. And that was from the – What effect does that have? I beg your pardon? What effect does that have? Well, under the statute, that would make him statutorily ineligible for asylum. As for the – But he's not claiming asylum here. Is that correct? I believe that Mr. Lam conceded, and it was conceded below, that the Petitioner was not challenging the finding of ineligibility. Mr. Lam did raise the – So that takes the – so his withdrawal of the asylum claim here takes the firm resettlement out of the case? Is that the – I'm sorry? I didn't hear all that. His withdrawal of the asylum case, essentially, before this Court. He said he's not seeking review of the denial of asylum. That takes the firm resettlement out of the case? Well, I think so. I think that that issue applies directly only to the issue of asylum, although Mr. Lam did raise whether the immigration court should not have given some deference to the fact of the Swedish Government having given him asylum. But, again, as the Court pointed out, I think, and the record reflects, that there's simply – there's just no evidence that was ever presented about why he was granted asylum or what the standards or criteria might be. I think the Court is familiar with the government's position. Are there any questions from the government counsel? Okay. Well, in that event, Your Honor, I'll just wrap up by saying that, as we've just The matter just argued is submitted for decision. And we'll hear the next case, which is Perez-Torres v. Kaisler.
judges: Schroeder, Hall, Bybee